USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 8-13-12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

IN RE: SUN EDISON, INC., ET AL.

                        DEBTORS.

CNH PARTNERS, LLC and AQR CAPITAL MANAGEMENT LLC,

                     APPELLANTS,

v.

SUNEDISON, INC.,

                     APPELLEE.

------------------------------------------------------------- x

1:17-cv-04778 (ALC)
1:17-CV-06745 (ALC)

OPINION AND ORDER

**ANDREW L. CARTER, JR., United States District Judge:**

CNH Partners, LLC ("CNH") and AQR Capital Management LLC ("AQR") (together, "Appellants") bring this appeal from the Bankruptcy Court's *Order Authorizing and Approving I(A) Entry into the Backstop Commitment Letter, (B) Equity Commitment Agreement, (C) Payment of the Fees and Expenses and (II) the Rights Offering Procedures and Related Forms* ("ECA Order") and *Findings of Fact, Conclusions of Law and Order Confirming Second Amended Plan of Reorganization of SunEdison, Inc. and its Debtor Affiliates* ("Confirmation Order") (together "Appealed Orders"). Appellee SunEdison, Inc. ("SunEdison") asserts that the appeal lacks merit and that, in any event, the appeal should be dismissed as equitably moot. For the following reasons, Appellants' appeal is dismissed as equitably moot.

## BACKGROUND

### I. Factual Background

On April 21, 2016, SunEdison and twenty-five affiliates ("Debtors") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code.[1] At the time the cases began, Debtors were engaged in disputes with numerous stakeholders, including the Official Committee of Unsecured Creditors ("Committee") and holders of Second Lien claims ("2L Claimholders"). The parties had engaged in negotiations for months.

#### A. ECA Motion

Debtors needed $300 million to fund their obligations under the plan to exit from Chapter 11 bankruptcy ("the Plan"). Accordingly, Debtors crafted an Equity Commitment Agreement ("ECA"). The ECA provided for a Rights Offering, pursuant to which 2L Claimholders had the right to participate in a $225 million offering of shares of Reorganized SunEdison and TerraForm Power, Inc. ("TERP"), and an interest in Reinstated Second Lien Claims, at a 7.3% discount ("Discounted Stock"). A subset of 2L Claimholders ("Backstop Purchasers") committed to fully backstopping the Rights Offering and to providing a $75 million commitment to directly purchase additional shares of Reorganized SunEdison and TERP. To ensure the full $300 million was raised, the ECA provided that Debtors would pay the Backstop Purchasers a "commitment fee" of 7% of the $300 million, or $21 million, in shares of Reorganized SunEdison and TERP upon consummation of the Rights Offering and the Debtors' emergence from Chapter 11. If the contemplated transactions were not consummated, on the other hand,

---

[1] The Chapter 11 cases were jointly administered under *In re: Sun Edison, Inc. et al.*, Chapter 11 No. 16-10992 (SMB).

Debtors would, under certain circumstances, pay a "breakup fee" to the Backstop Parties. *See* ECF No. 20 at 17-18 ("Appellants Br"); ECF No. 37 at 23-24 ("Appellee Br").

SunEdison filed a motion for approval of the ECA ("Backstop Motion") on April 24, 2017. A hearing on the ECA ("ECA Hearing" or "Backstop Hearing") was scheduled for May 19, 2017.

### B. Committee/BOKF Plan Settlement and ECA Modification

Meanwhile, Debtors had been in negotiations and mediation with the Committee, Bank of Oklahoma ("BOKF"), and Backstop Purchasers. On May 16, 2017, the parties announced a settlement ("Committee/BOKF Plan Settlement"). AQR participated in that settlement through its role as a member of the Committee.

In the initial ECA Motion, Debtors had proposed that the 2L Claimholders allow unsecured (junior) creditors to participate in up to 10% of the proposed Rights Offering. Following the Committee/BOKF Plan Settlement, however, Debtors withdrew that provision for the unsecured creditors, thus making the Rights Offering available only to 2L Claimholders. Appellee states that this change was prompted because the Committee and BOKF decided that certainty, in the cash and other consideration received in the approved settlement, was preferable to participation in the Rights Offering. Appellee Br at 21 n.15 (citing A5974[2]). Appellants argue this constituted a material change that prompted their objection, discussed below. Appellants Br at 18.

### C. AQR Objections and Counter-Offer

---

[2] References to Appellants' index are cited as "[A__]."

On May 16, 2017, AQR filed an objection to the Backstop Motion ("Backstop Objection"), arguing, in part, that the ECA was an improper exercise of Debtors' business judgment. At this time, the period for objections had closed.[3]

On May 19, 2017, approximately thirty minutes before the ECA Hearing began, AQR and certain 2L creditors who were not parties to the ECA ("Alternative 2Ls"), delivered an alternative plan ("AQR Offer"). As AQR describes, its Offer would reduce the Backstop Fee from 7% to 5% (or from $21 million to $13.5 million); reduce the Direct Equity Commitment from $75 million to $30 million; not charge the Backstop Fee on the direct equity commitment; and reduce the Breakup Fee from 3% of $300 million, or up to $9 million, to .1% or $300,000. Appellants Br at 18. AQR summarizes that its plan would allow Debtors to raise the same amount of capital but at a lower cost and with higher recoveries. *Id.*

The AQR Offer contained a five-day due diligence period, which would commence two days after the parties entered into a non-disclosure agreement ("NDA")—no later than May 23, 2017. *Id.* at 18-19.

**D. ECA Hearing**

The Bankruptcy Court (Stuart M. Bernstein, B.J.) held the ECA Hearing on May 19, 2017. The parties discussed two main issues.

First, AQR and the Alternative 2Ls urged the Court to postpone the hearing so that Debtors could fully consider the recently-delivered AQR Offer. Debtors argued that they should proceed with the hearing. They contended that they would be able to consider the AQR Offer at a later date, so long as they potentially paid up to $9 million in Breakup Fees. Confirming the

---

[3] Appellants appear to argue they were under the impression that they had an extension of time to file their objection, and that it was not appropriate to file objections when they were directly involved in the Plan negotiations. A6051-52. Whether or not Appellants' objections were timely would not alter this Court's decision.

Plan expeditiously was in their best interest even in the face of this Fee, Debtors argued, because of the complex and lengthy negotiations involved in crafting the Plan, uncertainty that the involved parties would support the AQR Offer, fluctuating stock prices, and $2.5 million Debtors were losing each week during bankruptcy. Further, they contested that the AQR Offer was actually an alternative plan since it still contained a due diligence period.

AQR, in contrast, argued that proceeding to confirmation was not an exercise of sound business judgment because their Offer would provide the same benefits while saving Debtors significant amounts of money; if Debtors waited to consider the AQR Offer until after confirmation they would have to pay millions of dollars in Breakup Fees; and there was no time limit on confirmation of the Plan and thus no rush to proceed that day.

Second, AQR argued that Debtors were engaged in vote buying. They contended that Debtors were not seriously considering the AQR Offer because the ECA was not simply a financing arrangement; instead, the ECA and BOKF/Committee Settlement Plan were an integrated package of benefits for 2L Claimholders. Essentially, they argued, the ECA Offer was a financial boon to the 2L Claimholders in exchange for their votes to confirm the Plan.

Debtors responded that there is no impropriety in soliciting approval for a confirmable plan, as the whole purpose of such negotiations is to develop a plan to exit Chapter 11 that everyone will support.

The Bankruptcy Court stated that the Plan "sounds a lot like lot buying," but deferred the issue until the Confirmation Hearing. A6041; 6196-97. The Court then approved the ECA and Rights Offering procedures, crediting Debtors' testimony that the certainty provided by proceeding to confirmation at that time outweighed the potential Breakup Fee they would incur if they later accepted the AQR Offer, and further that the ECA would provide Debtors with a

certain and expedited path out of bankruptcy and reduce ongoing administrative expenses. A6204-08.

On June 6, 2017, the Bankruptcy Court entered the Backstop Order, incorporating the record and findings made at the ECA Hearing, including that the ECA "reflects the Debtors' exercise of prudent business judgment" and "is in the best interests of the Debtors and their estates." A1473.

### E. Amendments and Subsequent Objection

On June 8, 2017 the ECA was amended to include the Alternative 2Ls—who had formerly been part of the AQR Offer—as additional Backstop Purchasers. Then on July 14, 2017, the ECA was amended to increase the total equity commitment to $300 million and extend the outside termination date from September 30, 2017 to November 15, 2017. In return, the Debtors modified the date by which the Rights Offering and Backstop must be funded from the Confirmation Hearing to a date closer to the Plan Effective Date.

On July 13, 2017, AQR filed a supplemental objection to Plan confirmation, asserting that the Plan was not proposed in good faith or feasible and that the Committee/BOKF Plan Settlement should not be approved. AQR moved to adjourn Plan confirmation based on the amendments to the ECA and again offered to provide financing.

### F. Confirmation Hearing

The Court held a Confirmation Hearing beginning on July 20, 2017. By that point, AQR was the only creditor that objected to the Plan. Two executives from Debtors, John S. Dubel and Homer Parkhill, testified about the benefits of the Plan and their belief that the Backstop Purchasers had the financial ability to fund the $300 million under the ECA. AQR cross-examined the individuals on the reasonableness of the Plan and argued that it constituted vote

buying. Additionally, the Bankruptcy Court *sua sponte* raised the issue of whether AQR, as an unsecured creditor, had standing to raise claims on behalf of the 2L class.

On July 28, 2017, the Bankruptcy Court overruled AQR's objection and confirmed the Plan. The Court found that, upon further analysis, Debtors did not engage in vote buying. A6703-05. The agreements were made in good faith and were reasonable, and the Plan was feasible. A6699-71. The Court also determined that AQR's objections were motivated not by a belief that the Plan was unreasonable but by a desire to obtain benefits of the Backstop that were not available to other unsecured creditors. A6696-97.

### G. Consummation

On December 29, 2017, the Effective Date of the Plan, "[a]ll conditions precedent to consummation of the Plan" were either "satisfied or waived in accordance with the Plan and Confirmation Order." Declaration of J. Eric Ivester ("Ivester Decl") Ex. A (ECF No. 46-1). Numerous transactions took place, including:

- Debtors completed the disposition of their interests in their most valuable subsidiaries to a third-party purchaser.
- SunEdison's equity securities were cancelled.
- The Rights Offering was consummated.
- New stock in Reorganized SunEdison was issued and distributed.
- Continuing TERP Class A shares were distributed and made freely tradeable, and Excess New TERP Class A Shares were distributed to the Backstop Purchasers.
- Various components of the Committee/BOKF Plan Settlement were consummated.
- Second Lien Claims totaling $150 million were reinstated.
- Reorganized Debtors became a privately-held company whose shares, while freely tradeable, are no longer traded on a recognized exchange.
- Reorganized Debtors distributed more than a half a billion dollars.

ECF No. 45 at 11 ("Appellee Mootness Br"); *see also* Ivester Decl. Ex. B, Status Report by John S. Dubel ("Dubel Rep") (ECF No. 46-2); Declaration of John S. Dubel ("Dubel Decl") (ECF No. 47).

## II. Procedural Background

On June 23, 2017, Appellants appealed from the ECA Order. ECF No. 1. Debtors initially sought to dismiss the appeal because, *inter alia*, the ECA Order was not a final order, since it would automatically be vacated if the Plan was not confirmed. ECF No. 4. This Court held oral arguments on this issue on August 10, 2017. *See* ECF No. 18. By that point, the Confirmation Order had already been entered, and Appellants had filed a separate appeal challenging that Order. *See id*; *In re SunEdison*, 17-cv-06745 (filed Sept. 5, 2017). The Court determined it would treat the cases as related, and ordered a consolidated briefing schedule for both appeals. *See* ECF No. 18.

On August 26, 2017 Appellants filed their opening brief arguing that the Bankruptcy Court erred in entering (1) the ECA Order, because the ECA constituted improper vote buying, the fees were not reasonable, and the ECA is a *Sub Rosa* Plan; and (2) the Confirmation Order, because the Court failed to properly consider whether the Plan was proposed in good faith, the Plan was not feasible, and the Committee/BOKF Plan Settlement was not reasonable. Appellants Br. Appellee responded in opposition on September 20, 2017, asserting that the Bankruptcy Court did not err in entering the ECA Order or the Confirmation Order, and further that Appellants lacked standing because they were not part of the 2L Class. Appellee Br. Appellants replied on October 3, 2017. ECF No. 39 ("Appellants Reply"). Appellee filed a sur-reply with respect to standing on October 16, 2017. ECF No. 40 ("Appellee Surreply").

On February 23, 2018, Appellee filed a motion to dismiss the appeal as equitably moot, arguing that the Plan has been substantially consummated and Appellants cannot overcome the attendant presumption of equitable mootness because, *inter alia*, Appellants never sought stays of the Orders pending appeal. Appellee Mootness Br. Appellants filed their opposition brief on

March 12, 2018, arguing that the equitable mootness doctrine does not require dismissal here. ECF No. 51 ("Appellants Mootness Br"). Appellee filed its reply on March 19, 2018. ECF No. 55 ("Appelee Mootness Reply").

Accordingly, the Court considers the motions fully submitted.

## DISCUSSION

### I. Equitable Mootness

#### A. Legal Standard

"Before considering the merits, the Court must address a threshold matter: whether this appeal is barred under the 'equitable mootness' doctrine." *In re Source Enters., Inc.*, 392 B.R. 541, 547-48 (Bankr. S.D.N.Y. 2008). The doctrine of equitable mootness "was developed judicially in response to the particular problems presented by the consummation of plans of reorganization under Chapter 11, in which the need for finality, and the need for third parties to rely on that finality, is of paramount importance." *In re BGI, Inc.*, 772 F.3d 102, 107 (2d Cir. 2014) (internal quotation marks and citation omitted). The doctrine is a "pragmatic" one that "that is 'grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable.'" *Id.* (quoting *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005)).

This Circuit "has recognized that bankruptcy appeals may be equitably moot in two situations: when an unstayed order has resulted in a 'comprehensive change in circumstances,' and when a reorganization is 'substantially consummated.'" *In re Delta Airlines, Inc.*, 374 B.R.

516, 522 (Bankr. S.D.N.Y. 2007) (citations omitted).[4] With respect to the second category, "a bankruptcy appeal is presumed equitably moot when the debtor's reorganization plan has been substantially consummated." *In re BGI*, 772 F.3d at 108 (citing *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482 (2d Cir. 2012)). That presumption can be overcome only if all five of the "*Chateaugay* factors" are met. The factors are:

> (1) 'the court can still order some effective relief';
> (2) 'such relief will not affect the re-emergence of the debtor as a revitalized corporate entity';
> (3) 'such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court';
> (4) 'the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings'; and
> (5) 'the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.'

*In re Charter Commc'ns, Inc.*, 691 F.3d at 482 (quoting *In re Chateaugay Corp.*, 10 F.3d 944, 952-53 (2d Cir. 1993)).

The appellant bears the burden of establishing that all *Chateaugay* factors are satisfied. *In re ION Media Networks, Inc.*, 480 B.R. 494, 499 (Bankr. S.D.N.Y. 2012). Further, "[o]nly if all five *Chateaugay* factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted." *In re Charter Commc'ns, Inc.*, 691 F.3d at 482. In this analysis, the fifth factor—whether the appellant sought a stay—is particularly significant. Indeed, "[i]n the absence of any request for a stay, the question is not solely whether we can provide relief without unraveling the Plan, but also whether we *should* provide such relief in light of fairness

---

[4] "While the Court of Appeals has not expressly formulated a test for when a 'comprehensive change of circumstances' renders it inequitable to hear an appeal, courts have found the same five equitable considerations listed [below] that can defeat a claim of mootness in the context of 'substantial consummation' to be instructive as well in the context of a 'comprehensive change of circumstances.'" *In re Delta Airlines*, 374 B.R. at 523 (collecting cases).

concerns." *In re Metromedia Fiber Network*, 416 F.3d at 145 (citations omitted) (emphasis in original).

### B. Analysis

#### i. Substantial Consummation

The threshold question is whether the Plan has been substantially consummated. "[S]ubstantial consummation" requires that "all or substantially all of the proposed transfers in a plan are consummated, that the successor company has assumed the business or management of the property dealt with by the plan, and that the distributions called for by the plan have commenced." *In re Charter Commc'ns*, 691 F.3d at 482 (citing 11 U.S.C. § 1101(2)).

Appellee contends that the Plan was substantially consummated on December 27, 2017, the Effective Date of the Plan, when "each of the conditions precedent to the effectiveness of the plan . . . was either satisfied or waived in accordance with the Plan and Confirmation Order. Dubel Decl ¶ 5. Appellants do not appear to dispute that this factor is met.

The Court agrees that the Plan has been substantially consummated. Accordingly, Appellants bear the burden of overcoming the presumption of mootness.

#### ii. *Chateaugay* Factors

##### 1. Whether the Court Can Fashion Effective Relief

Appellants appear to seek reversal of the ECA and, to the extent necessary, Confirmation Order and substitution of the AQR Offer in its place. Appellants essentially argue that this relief is still possible because the Court can reverse the ECA and Confirmation Orders by directing that the Backstop Fee be returned to Debtors and that the Discounted Stock that was sold to the Backstop Parties be auctioned in order to obtain a market price. They state that Appellee has

offered no evidence that any Backstop Purchaser has sold the stock, and that, in any event, they could buy it back.

Appellee argues that this relief is impossible, as it would require reinstating cancelled securities, cancelling newly issued securities that are already trading on the market, and undoing numerous other complex, already-consummated transactions. Appellee also notes that it is unclear whether the Court could even order the Backstop Purchasers to buy back any Discounted Stock that has been sold. Finally, Appellee argues that that ordering such relief would be unfair, as AQR did not take on any of the risk that the Backstop Purchasers assumed, but now seeks the reward earned by them when the risk paid off.

Here, it is highly improbable that the Court can order effective relief. While some transactions contemplated by Appellants might be technically possible, the Court cannot reverse numerous consummated transactions with third parties that are not part of these appeals. Indeed, the Court "does not see how such relief will have only minimal interference to other interests or that it would not disturb numerous consummated transactions and further transactions taken in reliance thereon." *In re Calpine*, 390 B.R. 508, 519 (Bankr. S.D.N.Y. 2008); *see also In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 652 (Bankr. S.D.N.Y. 1995) ("[A]ppellants do not seek to modify a discrete aspect of the Plan that would leave the remainder of the Plan intact. Rather, the appellants challenge the Plan in its entirety—they seek to undo sales of assets made both prior to and following the confirmation of the Plan.").

### 2. Effect on Re-Emergence as a Revitalized Entity and Unraveling of Intricate Transactions and Creation of Unmanageable Situation for the Bankruptcy Court

Even assuming the Court could order effective relief, it must consider whether such relief would impact Debtors' re-emergence as a revitalized entity or unravel intricate transactions.

Appellants contend that "a simple change in ownership of the Discounted Stock will not affect the Debtors' emergence from bankruptcy." Appellants Mootness Br at 24. Further, Appellants argue that the relief sought would not unravel intricate transactions because the auction to re-sell Discounted Stock would take place simultaneously with the return of Discounted Stock by Backstop Purchasers, and accordingly no payments previously made to third parties would need to be recovered.

Appellee responds that this change in stock is anything but simple, as it would deprive 2L Claimholders of their share ownership rights under the Plan and give that value to unsecured creditors. Such confiscation from the 2L class, Appellee contends, would lead to their demand for a return of whatever they paid for those shares. That in turn would require the Reorganized Debtors to repay hundreds of millions of dollars, depriving them of cash needed to emerge from bankruptcy, and reinstate the 2L Class's secured claims and liens, which would require re-negotiation an entirely new reorganization plan. Further, Appellee contends that the provisions of the Confirmation Order and Plan were "nonseverable and mutually dependent" and thus undoing some transactions would require renegotiating the entire Plan.

The Court agrees with Appellee. Appellants' proposed transactions would result in precisely the type of uncontrollable situation that the equitable mootness doctrine exists to guard against. Since the provisions of the Plan are "nonseverable and mutually dependent," the "parties would have to negotiate a new joint plan of reorganization and Debtors would be forced to reenter bankruptcy." *In re Calpine*, 390 B.R. at 521. "Quite simply, too many transactions have taken place at this point to grant [Appellants] the relief [they] seek[]." *In re Loral Space & Commc'ns, Ltd.*, 342 B.R. 132, 140 (Bankr. S.D.N.Y. 2006) (collecting cases).

### 3. Effect on Third Parties

Appellants must further establish that "the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings." *In re Loral*, 342 B.R. at 140 (citing *Chateaugay II*, 10 F.3d at 953).

Appellants contend that this factor is satisfied because the only parties that would be affected by the relief sought are Debtors—Appellee here—and the Backstop Purchasers, which have appeared in these appeals by counsel. Appellee contends that the number of parties involved is actually much larger, as 2L Claimholders who were not Backstop Purchasers received stock under the Plan, and third-party investors may have acquired such stock, or some interest in it, from 2L Claimholders.

The Court agrees with Appellee. Appellants have not met their burden on this factor.

### 4. Pursuance of Remedies to Obtain a Stay

"A chief consideration under *Chateaugay II* is whether the appellant sought a stay of confirmation." *In re Metromedia Fiber Network*, 416 F.3d at 144. "There exists a strong presumption that an appeal of an unstayed order is moot once a reorganization has been substantially consummated." *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 889 (Bankr. S.D.N.Y. 1994) (citation omitted). Indeed, this Circuit "insist[s] that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one." *In re Metromedia Fiber Network*, 416 F.3d at 144 (citing *In re Chateaugay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993)).

Here, Appellants never sought a stay of the Bankruptcy Court's orders or requested expedited review in this appeal. Appellants contend that they were not required to seek a stay because Debtors and Backstop Purchasers failed to obtain a good faith finding in the ECA Order, thus depriving them of the safe harbor provisions in 11 U.S.C. § 363(m). Moreover, Appellants argue that the doctrine of "unclean hands" bars Appellee from relying on equitable mootness

here, as the parties to the ECA failed to act in good faith. Appellee contends that § 363(m) is irrelevant to the question of equitable mootness and that, in any event, the Bankruptcy Court did make a good faith finding during the Confirmation Hearing, which encompassed the ECA.

Here, this factor counts against Appellants. The Bankruptcy Court's good faith finding appears to cover the ECA. Even if it did not, Appellants' argument that the safe harbor provisions do not protect Appellee does not abrogate Appellants' well-established obligation to seek a stay.

Since no factor, let along all five factors, counts in favor of Appellants, the appeal is equitably moot. Accordingly, "the Court need not consider the merits of [Appellants'] appeal." *In re Fiorano Tile Imports, Inc.*, 517 B.R. 409, 419 (Bankr. E.D.N.Y. 2014) (collecting cases).

For the foregoing reasons, this appeal is DENIED and the ECA and Confirmation Orders of the Bankruptcy Court are affirmed on the ground that the appeal is equitably moot. The Clerk of Court is respectfully requested to close this case.

**SO ORDERED.**

**Dated:** August 13, 2018
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**